UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X

In re                                                    Chapter 11 (Reorganized Debtor)

STARBRITE PROPERTIES CORP.,                              Case No. 11-40758 (CEC)

Reorganized Debtor.
---------------------------------------------------------X

## DECISION

### APPEARANCES

Wayne Greenwald, Esq.
Carlos Cuevas, Esq.
Cuevas & Greenwald, P.C.
1250 Central Park Avenue
Yonkers, New York 10704
Pro Se

Gabriel Del Virginia, Esq.
488 Madison Avenue, 19th Floor
New York, New York 10022
Attorney for the Reorganized Debtor

Alicia Leonhard, Esq.
Office of the United States Trustee
271 Cadman Plaza East, Suite 4529
Brooklyn, New York 11201

Rachel Blumenfeld, Esq.
26 Court Street, Suite 2400
Brooklyn, New York 11242
Attorney for Yolanda I. Nicholson, Esq.

John Russell, Esq.
60 E. 12th Street
New York, New York 10003
Pro Se

William Cordero
626 Flatbush Avenue
Brooklyn, New York 11238
Principal of the Debtor

Matthew P. Klein, Esq.
Kriss & Feuerstein LLP
360 Lexington Avenue
New York, New York 10017
Attorney for Madison Acquisition Group II LLC

CARLA E. CRAIG
Chief United States Bankruptcy Judge

This matter comes before the Court on the motion of Cuevas & Greenwald, P.C. ("C&G") for an order pursuant to section 107(b) of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to seal C & G's opposition (the "C&G Objection") to the motion of John Russell, Esq. ("Russell") to quash a subpoena issued by C & G to Russell.  For reasons explained herein, C & G's motion (the "Sealing Motion") is denied and the C & G Objection[1] will be docketed.  In addition, because the allegations set forth in the C & G Objection create reasonable grounds to believe that an investigation should be conducted to determine whether criminal violations under Chapter 9 of Title 18 of the United States Code have occurred, this matter will be referred to the United States Attorney for the Eastern District of New York (the "U.S. Attorney"), by transmittal of the C & G Objection and this Decision.  Moreover, because the professional conduct of the principals of C & G, Carlos J. Cuevas, Esq. ("Cuevas") and Wayne M. Greenwald Esq. ("Greenwald"), as described herein, raises questions concerning their compliance with the New York Code of Professional Conduct, especially Sections 1.6 and 3.3 thereof, this matter is referred to the Office of the United States Trustee for Region 2 (the "U.S. Trustee") for such investigation and action as the U.S. Trustee may deem appropriate. This Decision will also be forwarded to the Departmental Disciplinary Committee of the New York State Supreme Court, Appellate Division, First Judicial Department.

## **JURISDICTION**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1996.

---

[1] The C & G Objection consists of (i) a memorandum of law; (ii) a declaration in support by Carlos J. Cuevas (the "Cuevas Declaration"), and (iii) a voluminous set of exhibits to the Cuevas Declaration.

This is matter is a core proceeding under 28 U.S.C. §§157(b)(2)(A), 157(b)(2)(B), and 157(b)(2)(L).  This Decision constitutes the Court's findings of fact and conclusions of law to the extent required by Bankruptcy Rule 7052.

## BACKGROUND

On February 1, 2011, Starbrite Properties Corp. (the "Debtor") filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  William J. Cordero ("Cordero") is the president and sole shareholder of the Debtor.  Yolande I. Nicholson ("Nicholson") represented Cordero in his personal capacity in connection with this chapter 11 case.[2]  The Debtor has been in possession of its assets and management of its business affairs since the petition date pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No statutory committee has been appointed under section 1102 of the Bankruptcy Code.

Peter Mollo, Esq. filed the chapter 11 petition and schedules on behalf of the Debtor, and the Debtor filed on March 18, 2011 an application with the Court pursuant to section 327 of the Bankruptcy Code to retain Mr. Mollo as its counsel in this case.[3]  That application was never approved.  On or about March 11, 2011, C & G began to provide legal services to the Debtor in connection with this chapter 11 case.[4]  On May 10, 2011, the Debtor filed an application with the Court to retain C & G as its counsel *nunc pro tunc* to March 11, 2011.[5]  The retention application was accompanied by an affidavit

---

[2] According to C & G, Nicholson ceased her representation of Cordero in February 2012.  See *Application for Compensation for Cuevas & Greenwald, P.C. as Attorney for Reorganized Debtor*, (Docket No. 165), (the "Post-Confirmation Fee Application") at ¶ 301.

[3] (Docket No. 17).

[4] Post-Confirmation Fee Application at ¶ 50.

[5] (Docket No. 38).

signed by Cuevas, who identified himself as a member of C & G. Cuevas's affidavit further disclosed that he and Greenwald, another member of C & G, would have primary responsibility for the representation of the Debtor in this case. On July 5, 2011, the Court entered an order approving the retention of C & G as counsel to the Debtor pursuant to section 327 of the Bankruptcy Code *nunc pro tunc* to March 11, 2011.[6]

The Debtor's sole asset is the real property located at 626 Flatbush Avenue, Brooklyn, New York (the "Property"). The Property is a 30,000 square foot commercial building comprised of five units. At the time this chapter 11 case was filed, the Property was the subject of a foreclosure proceeding in state court commenced by AIA Capital LLC ("AIA"). AIA, as the assignee of certain promissory notes, contended that it was owed debt secured by the Property in an amount not less than $3,223,884.58. The Debtor disputed the validity of AIA's claim on the grounds that there was no effective assignment of the promissory notes to AIA under applicable New York state law.

On December 20, 2011, the Court entered an order (the "Confirmation Order") approving the Debtor's plan of reorganization (the "Plan").[7] In conjunction with the Plan, the Debtor and AIA entered into, and the Court approved, pursuant to Bankruptcy Rule 9019, a settlement agreement that fixed the amount of AIA's secured claim against the Debtor at $2,825,500.00.[8] The Debtor also secured, with the Court's authorization, exit financing in the amount of $3,850,000 (the "Exit Loan") from Madison Acquisition

---

[6] (Docket No. 59). On April 18, 2012, Gabriel Del Virginia, Esq. filed a notice of appearance on behalf of the reorganized debtor (Docket No. 180).

[7] (Docket No. 142). Both the Plan and the disclosure statement in support of the Plan were signed by Cordero as president of the Debtor and Greenwald as counsel to the Debtor.

[8] (Docket No. 141).

Group II LLC ("Madison").  The Confirmation Order specifically approved the Exit Loan

under section 364(e) of the Bankruptcy Code.  See Confirmation Order at 14-15.

Proposed loan documents in connection with the Exit Loan were filed on the docket[9] and

were approved pursuant to the Confirmation Order, id. at 15.  The Confirmation Order

further found that the Plan was feasible because of the expected infusion of capital from

the Exit Loan, id. at 11, and that the Debtor had acted in "good faith and not by any

means forbidden by law," id. at 8.

The Exit Loan was an integral part of the Plan and enabled the Debtor to fully

pay AIA and all other classes of claims.[10]  The Exit Loan was collateralized by the

Property. In addition, Madison required that Cordero and Flatbush Parking Systems, Inc.

("Flatbush") each execute a guaranty for the Exit Loan.  Flatbush is an entity owned by

Cordero and is also a party to a lease at the Property.

The Plan became effective on February 3, 2012 when the Exit Loan transaction

closed, and the Plan was substantially consummated on February 6, 2012 when payments

under the Plan were made.[11]

Prior to the confirmation of the Plan, C & G sought approval for compensation for

services rendered to the Debtor from March 11, 2011 to December 7, 2011 in the amount

of $321,784.[12]  The U.S. Trustee raised an informal objection to the amount of the

compensation sought by C & G and after discussions with the U.S. Trustee, C & G

---

[9] (Docket No. 129).

[10] Under the terms of the Plan, the secured claims of AIA constituted a single class.  Other classes under the Plan were (i) other secured claims, (ii) priority tax claims, and (iii) general unsecured claims.  No balloting with respect to the Plan was necessary because all claims were paid in full in their allowed amounts.

[11] Post-Confirmation Fee Application at ¶¶ 129-131.

[12] (Docket No. 120).

agreed to reduce the amount of its requested compensation to $250,000.  On December 19, 2011, the Court entered an order approving the payment of $250,000 to C & G as professional compensation.[13]  Proceeds from the Exit Loans were used to pay the bulk of C & G's Court-approved professional compensation.[14]

On March 5, 2012, following the consummation of the Plan, C&G filed the Post-Confirmation Supplemental Fee Application seeking an additional $205,725 in compensation and an additional $1,989.86 in expense reimbursement for certain post-confirmation services.  A hearing on the Post-Confirmation Fee Application was scheduled for April 18, 2012.[15]

According to the Post-Confirmation Fee Application, "Cordero emphatically, unequivocally and repeated[ly] stated [to C & G] that he would not pay [ ] C&G for its [post-confirmation] service."[16]  C & G asserted that the services set forth in the Post-Confirmation Fee Application were rendered necessary by a number of "crises" created by Cordero that threatened to derail the Debtor's reorganization, including, among other things, (i) Cordero's refusal to sign the disclosure statement in support of the Plan,[17] (ii) his refusal to pay a loan commitment fee to Madison,[18] (iii) the unexplained corporate dissolution of Flatbush and the consequent need to reinstate Flatbush's corporate status

---

[13] (Docket No. 140).  The Court also approved reimbursement of expenses incurred by C & G in the amount of $3,026.37.

[14] See Exhibit to *Order Granting the Debtor's Application for the Court to Approve an Amended Schedule for the Distribution of Loan Proceeds* (Docket No. 156) (noting that $228,026.37 from the Exit Loan were "earmarked" for C & G).  C & G was also paid a retainer in the amount of $25,000.

[15] The Court is currently scheduled to hear the Post-Confirmation Fee Application on June 13, 2012.

[16] Post-Confirmation Fee Application at ¶ 10.

[17] Id. at ¶¶100-110.

[18] Id. at ¶¶111-121.

on an emergency basis,[19] (iv) his "uncooperative [and] abusive"[20] conduct which "transformed the Madison closing into a four day affair that included three court hearings,"[21] and (v) his refusal to pay his personal counsel, Nicholson.[22]

No party filed an objection to the Post-Confirmation Fee Application. However, in anticipation of an objection by Cordero, C&G served notices of deposition and subpoenas on third-party witnesses, including Russell, an attorney for Cordero. Russell represented Cordero in a civil action in the United States District Court for the Eastern District of New York captioned <u>Caliente Cab Restaurant Co., Inc. v. Caliente Café Restaurant & Bar, Inc. and William Cordero</u>, (Case No. 11-cv-00327(RJD)) (the "Trademark Infringement Action") in which Cordero and a company owned by Cordero were accused of violating federal trademark laws. On April 4, 2012, Russell filed a motion seeking a protective order quashing the subpoena which C&G served on him (the "Protective Motion") contending, among other things, that the discovery requests were too broad in scope and the documents sought by C & G were protected by the attorney-client privilege. In response to the Protective Motion, C & G filed the Sealing Motion, contending that its objection to the Protective Motion would reveal "evidence which may be considered scandalous" and "can have negative repercussions for its client, Starbrite."[23] C & G explained that the discovery sought from Russell was needed to

---

[19] <u>Id.</u> at ¶¶158-178.

[20] <u>Id.</u> at ¶207.

[21] <u>Id.</u> ¶¶ at 207, 179-209.

[22] <u>Id.</u> ¶¶ at 210-259. One "crisis" referenced in the Post-Confirmation Fee Application cannot be attributed to the fault of Cordero. It instead stemmed from the need of the Debtor's estate to defend against a frivolous claim on the title to the Property by Ra Maa Nu Amen, Moorish Nation. <u>Id.</u> at ¶¶ 141-157.

[23] <u>See</u> Sealing Motion at ¶¶ 24-25.

impeach Cordero in connection with the anticipated objection to the Post-Confirmation

Fee Application.  C & G further asserted that the crime-fraud exception to the attorney-

client privilege precluded Russell from invoking the attorney-client privilege in response

to C & G's discovery requests.  C & G mailed a copy of the C & G Objection to the

Court[24] and served another copy on the U.S. Trustee.  The C & G Objection was not

docketed.  It is not clear if any other parties in interest received a copy of the C & G

Objection, as no affidavit of service was filed on the docket.

At a Court hearing held on April 18, 2012, the Court stated that it would deny the

Sealing Motion and questioned the propriety of the professional conduct of Cuevas and

Greenwald in connection with the Sealing Motion and the implementation of the Plan.  C

& G withdrew on the record all notices of deposition and subpoenas related to the Post-

Confirmation Fee Application.  As a result, the Protective Motion became moot.[25]

The C & G Objection alleges that Cordero defrauded Madison in connection with

the Debtor's application for the Exit Loan.  Specifically, C & G alleges, first, that

Cordero failed to disclose to Madison that he was a defendant in the Trademark

Infringement Action and that two judgments had been entered against him in that action,

even though the application for the Exit Loan required disclosure of any pending

---

[24] There was no request for the Court to review the C & G Objection in camera.

[25] On May 15, 2012, the U.S. Trustee filed an objection opposing the relief sought in the Sealing Motion (Docket No. 182).  The objection, which has been served on the (i) Debtor, (ii) its legal counsel, Mr. Del Virginia and (iii) Mr. Russell, states that the U.S. Trustee "would have no objection if the Court provides the Debtor's principal [Cordero] with a short amount of time to request the sealing of the information" contained in the C & G Objection. Id. at 9.  Since the submission of the objection by the U.S. Trustee, Cordero has not filed a request under section 107 of the Bankruptcy Code or otherwise responded to the suggestion of the U.S. Trustee.  Moreover, the legal analysis set forth herein would not materially change if a section 107 request were filed by Cordero.  Given the allegations of dishonesty and potential criminal conduct in connection with the Exit Loan and the consummation of the Plan raised in the C & G Objection, sealing of the C & G Objection under section 107 is not warranted.

lawsuits to which Cordero was a party and any judgments entered against Cordero.[26]

Second, the C&G Objection alleges that Cordero submitted to Madison two false income

tax returns for Flatbush for tax years 2009 and 2010.  With respect to the purportedly

false income tax returns, C & G asserts that the returns submitted to Madison overstated

Flatbush's gross income for the two tax years in question by a total of $464,000, which

Cuevas characterizes in his declaration as "a tremendous discrepancy."[27]  Included in the

voluminous attachments to the C & G Objection are (i) judgments entered against

Cordero in the Trademark Infringement Action (Exhibits C and E); (ii) loan application

documents submitted to Madison in connection with the Exit Loan on which Cordero

failed to disclose information related to the Trademark Infringement Action (Exhibits B

and D); (iii) a set of purportedly genuine corporate tax returns for Flatbush (Exhibits O

and P); and (iv) another set of corporate tax returns for Flatbush with inflated income

numbers that Cordero allegedly submitted to Madison in connection with the Exit Loan

application (Exhibits M and N).  Cuevas states under oath in his declaration that "two sets

of tax returns functioned as two sets of financial books and "[i]t appeared that Mr.

Cordero was attempting to defraud Madison [  ] and the taxing authorities."[28]  In an

extended footnote providing his analysis of the applicability of a number of criminal

provisions to the conduct alleged in the C & G Objection, Cuevas contends that (i)

"[t]here is probable cause to believe that Mr. Cordero devised and intended a scheme to

defraud Madison" in violation of the federal wire fraud statute, 28 U.S.C. § 1343; (ii)

"Mr. Cordero's fraud occurred in relation to the loan from Madison Realty which

---

[26] Cuevas Declaration at ¶ ¶ 66, 67 and 124.

[27] Id. at 24-25, n.3.

[28] Id. at ¶¶153, 154

occurred during the Chapter 11 case and this Court approved the Madison loan," thereby

invoking 18 U.S.C. § 157(3), which provides criminal penalties for bankruptcy fraud; (iii)

Cordero's submission of false tax returns and concealment of the Trademark Infringement

Action from Madison constituted bank fraud under 18 U.S.C § 1344, and (iv) Cordero

might have committed tax fraud, 26 U.S.C. § 7201, and tax perjury, 26 U.S.C. § 7206(1).[29]

    C & G claims that upon discovering existence of the two sets of tax returns in

January 2012, it urged Cordero to make proper disclosures to Madison and also brought

the matter to the attention of Nicholson who was then Cordero's personal counsel,[30] but

to no avail.  Cordero allegedly instructed Cuevas to "leave the situation alone."[31]

## **DISCUSSION**

### *The Sealing Motion Must Be Denied*

    Court proceedings and records of those proceedings are open to the public,

barring exceptional circumstances.  This qualified right of public access is deeply rooted

in both the common law, <u>Nixon v. Warner Commc'ns, Inc.</u>, 435 U.S. 589 (1978), and the

First Amendment, <u>Video Software Dealers Ass'n v. Orion Pictures Corp.</u> (<u>In re Orion</u>

<u>Pictures Corp.</u>), 21 F.3d 24, 26 (2d Cir. 1994).  As the Second Circuit observed recently,

"[w]ithout publicity, all other checks [on government power] are insufficient: in

comparison of publicity, all other checks are of small account." <u>New York Civil Liberties</u>

<u>Union v. New York City Transit Authority</u>, --- F.3d ----, 2012 WL 10972 at *7 (2d Cir.

---

[29] <u>Id.</u>

[30] C & G contends that Nicholson also represented at that time Flatbush, an assertion that Nicholson denies. <u>See</u> Exhibit Q to the Cuevas Declaration.

[31] Cuevas Declaration at ¶ 140.

January 4, 2012) (internal quotation marks and citation omitted); see also In re Bell &

Beckwith, 44 B.R. 661, 664 (Bankr. N.D. Ohio 1984) (noting that a "policy of open

inspection . . . is fundamental to the operation of the bankruptcy system and is the best

means of avoiding any suggestion of impropriety that might or could be raised.").

Section 107 governs public access to records filed in the bankruptcy court system

and a bankruptcy court's power to seal those records.  It provides in pertinent part:

> (a) Except as provided in subsections (b) and (c), of this section and
> subject to section 112, a paper filed in a case under this title and the
> dockets of a bankruptcy court are public records and open to examination
> by an entity at reasonable times without charge.
>
> (b) On request of a party in interest, the bankruptcy court shall, and on the
> bankruptcy court's own motion, the bankruptcy court may—
>
>> (1) protect an entity with respect to a trade secret or confidential
>> research, development, or commercial information; or
>>
>> (2) protect a person with respect to scandalous or defamatory
>> matter contained in a paper filed in a case under this title.

11 U.S.C. § 107

Section 107 is implemented through Bankruptcy Rule 9018, which provides that:

> On motion or on its own initiative, with or without notice, the court may
> make any order which justice requires (1) to protect the estate or any
> entity in respect of a trade secret or other confidential research,
> development, or commercial information, (2) to protect any entity against
> scandalous or defamatory matter contained in any paper filed in a case
> under the Code, or (3) to protect governmental matters that are made
> confidential by statute or regulation. If an order is entered under this rule
> without notice, any entity affected thereby may move to vacate or modify
> the order, and after a hearing on notice the court shall determine the
> motion.

Fed. R. Bankr. P. 9018.

Section 107 has displaced common law rules of access with respect to bankruptcy

court records.  In re Roman Catholic Archbishop of Portland in Oregon, 661 F.3d 417,

430-31 (9th Cir. 2011).  If a party in interest seeks protection for confidential commercial information or scandalous or defamatory materials under section 107(b) and one of the exceptions to the rule of public access set forth therein is applicable, a bankruptcy court is required to provide such protection.  In re Food Mgmt. Group, LLC, 359 B.R. 543, 554 (Bankr. S.D.N.Y. 2007); In re Barney's, Inc., 201 B.R. 703, 707 (Bankr. S.D.N.Y. 1996); Phar-Mor, Inc. v. Defendants Named Under Seal (In re Phar-Mor, Inc.), 191 B.R. 675, 679 (Bankr. N.D. Ohio 1995).

Exceptions to public access are construed narrowly.  Orion Pictures Corp., 21 F.3d at 27 (noting that "a judge must carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need" to invoke section 107); see also Ferm v. United States Trustee (In re Crawford), 194 F.3d 954, 960, n.8 (9th Cir. 1999) (noting that "exceptions . . . are construed narrowly"); In re Analytical Sys., Inc., 83 B.R. 833, 835 (Bankr. N.D. Ga. 1987) (noting that "[b]ased on Section 107 and the strong precedent of federal case law, this court concludes that sealing judicial records is appropriate only in very limited situations.").  Any party in interest seeking to restrict public access to bankruptcy court records has the burden of proof.  Chase v. Chase (In re Chase), 2008 WL 2945997, at *6 (Bankr. S.D.N.Y. July 25, 2008); see also Neal v. The Kansas City Star (In re Neal), 461 F.3d 1048, 1053 (8th Cir. 2006) ("[M]ovants "must show that . . . the allegations . . . are scandalous.").

Section 107(b)(2) protects "a person with respect to scandalous or defamatory matter contained in a paper filed in a case." 11 U.S.C. § 107(b)(2).  C & G has not asserted that any of the materials in the C&G Objection are defamatory,[32] but has

---

[32] The Sealing Motion specifically concedes that it contains nothing defamatory because the allegations therein are alleged to be true.  See Sealing Motion at 5 n.2.

contended that the C & G Objection "contain[s] scandalous evidence [which] will have disastrous consequences for the [Debtor and] alter a reasonable person's favorable opinion of [Cordero]."[33]

Neither § 107 nor any other provision of the Bankruptcy Code, the Bankruptcy Rules or the Federal Rules of Civil Procedure define "scandalous."  Courts have used various definitions to determine what constitutes "scandalous matter" under section 107.  See Food Mgmt. Group, 359 B.R. at 555.  Some courts have examined Black's Law Dictionary, which defines "scandalous" as a "matter that is both grossly disgraceful (or defamatory) *and irrelevant to the action or defense.*" Id. at 557 n.14 (quoting BLACK'S LAW DICTIONARY 1372 (8th ed. 2004)) (emphasis added); Roman Catholic Archbishop, 661 F.3d at 432 (quoting two other dictionaries).

Other courts have turned to interpretations of scandalous under Fed. R. Civ. P. 12(f), which provides that "[t]he court may strike from a pleading . . . any . . . scandalous matter." Food Mgmt. Group, 359 B.R. at 557-58 (discussing Fed. R. Civ. P.12(f)); Hope v. Pearson, 38 B.R. 423, 424-25 (Bankr. M.D. Ga. 1984) (same).  One leading treatise defines "scandalous matter" in the context of Fed. R. Civ. P. 12(f) as any "any allegation that *unnecessarily* reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court."  Food Mgmt. Group, 359 B.R. at 558 n.16 (quoting 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.37[3] (3d ed. 2006)) (emphasis added).

Thus, "courts will not strike scandalous statements that offend the sensibilities of the objecting party if the challenged allegations describe acts or events relevant to the

---

[33] Id. at 2.

action." Id. (citing 5C CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL

PRACTICE AND PROCEDURE § 1382). As the Food Mgmt. Group court noted, "the

relevance standards articulated in the context of Rule 12(f) apply as well in determining

whether protection is warranted under § 107(b)(2)." Id. at 558-59.

Accordingly, the 107(b)(2) exception cannot be invoked "merely because [a court

filing] would have a detrimental impact on an interested party's reputation." Id. at 555

(citing In re Gitto Global Corp., 422 F.3d 1, 11(1st Cir. 2005)). "Section 107(b) is not

intended to save the debtor or creditors from embarrassment." Id. at 554 (citing In re

Muma Services Inc., 279 B.R. 478, 484 (Bankr. D. Del. 2002)). In other words, potential

injury to a party's reputation is not by itself an adequate basis to seal a document. Neal,

461 F.3d at 1054 ("The unintended, potential secondary consequence of negative publicity"

does not warrant sealing). Nor is the fact that a filing is embarrassing to a party-in- interest

"a sufficient basis to justify sealing court  records in the  face of the express and important

policy of public access to court records." Analytical  Sys., 83 B.R. at 836.  Moreover, as the

Food Mgmt. Group court noted, "[t]he public interest in openness of court proceedings is *at

its zenith when issues concerning the  integrity and transparency of bankruptcy court

proceedings are involved*." Food Mgmt. Group, 359 B.R at 553 (emphasis added).

Nothing set forth in the C & G Objection is scandalous within the meaning of

section 107(b)(2).  The facts presented in the C & G Objection are broadly analogous to

those in Food Mgmt. Group.  In that case, a chapter 11 trustee filed an adversary

complaint against the debtor's former counsel alleging fraudulent concealment and breach

of fiduciary duty. Id. at 561.  Among other things, the trustee accused the defendant of

concealing from the bankruptcy court his connection to another party in the bankruptcy

case and continuing to represent that party while representing the debtor. Id. at 551.  The

defendant moved for the sealing of the adversary complaint.  The <u>Food Mgmt. Group</u> court acknowledged that failure to seal the complaint would likely cause the defendant "prejudice, negative publicity or possible financial adversity."  <u>Id.</u> at 561.  But the court found that the likely adverse impact of the court filing on the defendant was not sufficient to overcome the "countervailing statutory, constitutional and policy concerns" militating for public access to court records.  <u>Id.</u> (internal quotation marks and citation omitted).

Moreover, the <u>Food Mgmt. Group</u> court concluded the allegations contained in the adversary complaint were relevant because they related to the defendant's disinterestedness as an attorney for the debtor and his lack of candor to the court.  <u>Id.</u> at 562-64.  The allegations set forth in the C & G Objection are likewise relevant in this case because, if true, they depict a deliberate subversion of the integrity of the chapter 11 process by the principal of the Debtor.  The C & G Objection contains allegations made under oath by Cuevas that Cordero engaged in fraudulent and potentially criminal conduct to obtain a Court-approved loan necessary for the consummation of the Plan in this bankruptcy case.  Sealing of a court filing is especially inappropriate when issues concerning the integrity and transparency of bankruptcy court proceedings and the bankruptcy process are implicated in that filing.  <u>Id.</u> at 553.  The Court is "entitled to demand utmost good faith and honesty" from all participants in the bankruptcy process. <u>In re Condon</u>, 358 B.R. 317, 328 (6th Cir. BAP 2007) (quoting <u>In re Marrama</u>, 430 F.3d 474, 482 (1st Cir. 2005)).  <u>See</u> <u>also</u> <u>In re Coastal Cable T.V., Inc.</u>, 709 F.2d 762, 764 (1st Cir. 1983) (noting that "[a basic bankruptcy] principle prohibits the use of the bankruptcy court, a court of equity, to further a fraudulent purpose.").  The allegations contained in the C & G Objection raise serious questions about the honesty and candor of some

participants in this chapter 11 case and, as a result, the public interest in openness with

respect to these matters is "at its zenith." Food Mgmt. Group, 359 B.R at 553. For these

reasons, the Sealing Motion is denied.

### The C & G Objection Must Be Disclosed to Madison and Cordero

Pursuant to Canon 3(a)(4) of the Code of Conduct for United States Judges (the

"Code of Conduct"), "a judge should not initiate, permit, or consider ex parte

communications or consider other communications concerning a pending or impending

matter that are made outside the presence of the parties or their lawyers." That Canon

further directs that if an ex parte communication is received that "bear[s] on the substance

of a matter, the judge should promptly notify the parties of the subject matter of the

communication and allow the parties an opportunity to respond, if requested." The C &

G Objection was mailed unsolicited to the Court, and it was served only on the U.S.

Trustee and apparently no other party. The transmittal of the C & G Objection to the

Court therefore constitutes an ex parte communication. See In re Complaint of Judicial

Misconduct, 425 F.3d 1179, 1188, n.4 (9th Cir. 2005) (stating that "[e]x parte

communications are those that involve fewer than all of the parties who are legally

entitled to be present during the discussion of any matter.") (internal quotation marks and

citation omitted).

In this case, the ex parte communications set forth in the C & G Objection are of

great potential significance to Madison, a party in interest in this chapter 11 case, because

the C & G Objection contains allegations that Cordero defrauded Madison in connection

with the Exit Loan. Fairness requires that both Madison and Cordero be notified of the

substance of this ex parte communication. Consistent with the Code of Conduct, the Court

will (i) forward copies of the C & G Objection to Madison and Cordero and their

respective counsel and (ii) docket the C & G Objection.

*This Matter Must Be Referred to the United States Attorney for the Eastern District of New York*

18 U.S.C. § 3057 provides in relevant part that

> (a) Any judge . . . having reasonable grounds for believing that any violation under chapter 9 of this title or other laws of the United States relating to insolvent debtors, receiverships or reorganization plans has been committed, or that an investigation should be had in connection therewith, shall report to the appropriate United States attorney all the facts and circumstances of the case, the names of the witnesses and the offense or offenses believed to have been committed.

18 U.S.C. § 3057

Section 3057 "was intended primarily as an administrative measure—a

congressional directive to the district offices of the United States Attorneys to become

more active in the prosecution of bankruptcy fraud cases." In re Valentine, 196 B.R. 386,

388 (Bankr. E.D. Mich. 1996).  Thus, a bankruptcy judge is required to refer a matter to

the U.S. Attorney where there are "reasonable grounds" for believing that (i) a

bankruptcy-related criminal offense has occurred or (ii) "an investigation should be had

in connection therewith."  Congress's use of the word "shall" indicates that a referral by

a bankruptcy judge is mandatory if the conditions described in Section 3057 are satisfied.

In re Halko, 203 B.R. 668, 675 (Bankr. N.D. Ill. 1996) (stating that bankruptcy courts

have an "express and independent duty to refer [under section 3057]").

Chapter 9 of Title 18 of the United States Code includes a number of criminal

provisions designed to protect the integrity of the bankruptcy process.  For example,

Section 157 provides for criminal sanctions to be imposed upon a person "who, having

devised or intending to devise a scheme or artifice to defraud and for the purpose of

executing or concealing such a scheme or artifice or attempting to do so— . . . makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11, at any time before or after the filing of the petition." 18 U.S.C. § 157(3). The C & G Objection asserts that Cordero violated this provision in connection with the application for the Exit Loan.[34]

In addition, the C & G Objection further asserts that the alleged conduct of Cordero in connection with the Exit Loan violated the following non-bankruptcy federal criminal provisions: (i) 26 U.S.C. § 7201 (relating to tax evasion); (ii) 26 U.S.C. § 7206 (relating to tax perjury); (iii) 28 U.S.C. § 1343 (relating to wire fraud); and (iv) 18 U.S.C. § 1344 (relating to bank fraud).[35]

Other bankruptcy courts have made referrals under section 3057 after determining that (i) a bond document submitted by a chapter 13 debtor was fraudulent, In re Harrison, 390 B.R. 590, 595 (Bankr. N.D. Ohio 2008); (ii) a debtor had concealed a substantial non-exempt asset, In re Hill, 377 B.R. 8, 27 (Bankr. D. Conn. 2007); and (iii) an attorney had received unauthorized legal fee, In re Andreas, 373 B.R. 864, 867-68 (Bankr. N.D. Ill. 2007).

In light of the disclosures in the C & G Objection, there exist reasonable grounds to believe that an investigation should be had as to whether Cordero or any of the other participants in the Exit Loan transaction engaged in conduct that constitutes a violation of any of the provisions of Chapter 9 of Title 18 or any other applicable criminal laws of the United States.

---

[34] See Cuevas Declaration at 24-25, n.3.

[35] Id.

Accordingly, pursuant to section 3057 of Title 18 of the United States Code, this Decision and the C & G Objection will be transmitted to the U.S. Attorney.

<u>Referral to the U.S. Trustee</u>

The Rules of Professional Conduct (the "Rules") promulgated by the Appellate Divisions of the Supreme Court of New York apply to attorneys who appear before federal bankruptcy courts sitting in New York.  <u>Kittay v. Kornstein</u>, 230 F.3d 531, 538 n.2 (2d Cir.2000) (citing <u>In re Allboro Waterproofing Corp.</u>, 224 B.R. 286, 291 n. 3 (Bankr. E.D.N.Y. 1998)).  Pursuant to applicable local rules, attorneys are required to become familiar with the Rules before they may be admitted to practice in this District. <u>See</u> S.D.N.Y. & E.D.N.Y.L. Civ. R. 1.3(a); E.D.N.Y. LBR 2090-1(a).

Rule 3.3 ("Conduct Before a Tribunal") covers a lawyer's duty of candor to a tribunal.[36]  Rule 3.3(a)(3) provides:

> If a lawyer, the lawyer's client, or witness called by the lawyer has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.

Rule 3.3(b) provides:

> A lawyer who represents a client before a tribunal and who knows that a person . . . is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.

Rule 3.3(c) provides:

> The duties stated in paragraphs (a) and (b) apply *even if compliance* requires disclosure of information otherwise protected by Rule 1.6.[37]

---

[36] Under the Rules, the term "Tribunal" is broadly defined to encompass "a court, an arbitrator in an arbitration proceeding or a legislative body, administrative agency or other body acting in an adjudicative capacity."  Rule 1.0(w).  This definition plainly covers a federal bankruptcy court.

[37] Rule 1.6 ("Confidentiality of Information") governs a lawyer's obligation to safeguard "confidential information."

Comment [12] to Rule 3.3 notes that "[l]awyers have a special obligation as officers of the court to protect a tribunal against criminal or fraudulent conduct." As a result, the Code "*requires* a lawyer who represents a client in an adjudicative proceeding to take reasonable remedial measures, *including disclosure if necessary*, whenever the lawyer knows that a person, including the lawyer's client, intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding." Id. (emphasis added).

Here, if the allegations in the C & G Objection are true, Cuevas and Greenwald became aware of the fraud that was used to procure the Exit Loan no later than January 10, 2012 when Cuevas sent an email to Nicholson alerting her to the alleged existence of a second set of income tax returns. According to the Cuevas Declaration, Cuevas and Greenwald sought to persuade Nicholson and Cordero to make a candid disclosure to Madison. But when these remedial measures failed, Cuevas and Greenwald took no further steps to remedy the fraud that Cordero was apparently about to perpetrate on Madison. Instead, they permitted the Exit Loan to close in February 2012 with knowledge that representations made to Madison in the Exit Loan documents were in their view false. This alleged fraud, if it occurred, also compromised the integrity of the chapter 11 process in that the Exit Loan was expressly approved by the Court and was necessary to the effectiveness and consummation of the Plan. C & G directly benefited from the closing of the Exit Loan because proceeds from that loan funded payment of a substantial portion of C & G's Court-approved professional compensation for pre-confirmation legal work.

Rather than disclosing to the Court this allegedly fraudulent conduct by Cordero **before** the Exit Loan was closed, in accordance with their obligations under Rule 3.3, Cuevas and Greenwald instead disclosed confidential information only **after** the Exit Loan had closed and the proceeds of the Exit Loan had been distributed. Their acknowledged reason for disclosing confidential information was to attack Cordero's credibility in connection with his anticipated (but never filed) objection to the Post-Confirmation Fee Application.[38]

A fundamental principle in the client-lawyer relationship is that, in the absence of the client's informed consent, or except as permitted or required by the Rules or other applicable law, the lawyer must not knowingly reveal information gained during and related to the representation, whatever its source. The professional duty of client-lawyer confidentiality, set forth in Rule 1.6, applies to a lawyer in all settings and at all times. Confidential information is defined in the Rules as information gained during or relating to the representation of a client, whatever its source, that is (i) protected by the attorney-client privilege, (ii) likely to be embarrassing or detrimental to the client if disclosed, or (iii) requested by the client to be kept confidential. See Rule 1.6(a). Whether or not the information revealed in the C & G Objection falls within the parameters of the attorney-client privilege, it would appear to meet the definition of confidential information set forth in Rule 1.6(a).

Although Rule 3.3 provides an exception to the lawyer's duty of confidentiality where information must be disclosed to a tribunal to prevent criminal or fraudulent

---

[38] See Cuevas Declaration at ¶ 63.

conduct related to a proceeding before that tribunal, Cuevas and Greenwald revealed to the Court the confidential information set forth in the C & G Objection only after the Exit Loan was closed and the loan proceeds had been distributed, when no apparent remedial purpose under Rule 3.3 could be served. Moreover, the C & G Objection makes it clear that these disclosures are not being made in an attempt to rectify Cordero's allegedly fraudulent behavior, but rather for a self-serving purpose, to portray Cordero as a person lacking credibility in order to undercut his anticipated objection to the Post-Confirmation Fee Application.[39]

Rule 1.6 permits "disclosure [of confidential information] to the extent that the lawyer reasonably believes necessary [to] establish or collect a fee." See Rule 1.6(b)(5)(2). However, the Post-Confirmation Fee Application was never objected to. It is therefore difficult to see how the discovery campaign undertaken by C & G, or the disclosures of confidential information made in the C & G Objection, could be considered "necessary" to prosecute the Post-Confirmation Fee Application. Indeed, the confidential information revealed in the C & G Objection has no apparent bearing on the merits of the Post-Confirmation Fee Application.

For these reasons, the matter of the professional conduct of Cuevas and Greenwald in this chapter 11 case will be referred to the U.S. Trustee for such investigation and further action as she may deem appropriate. The U.S. Trustee is directed to file a report with the Court upon the completion of the investigation. In addition, this Decision will be forwarded to the Departmental Disciplinary Committee of the New York State Supreme Court, Appellate Division, First Judicial Department.

---

[39] Id.

## <u>CONCLUSION</u>

The Sealing Motion is denied.  The Court will docket the C & G Objection and refer this matter to (i) the U.S. Attorney, and (ii) the United States Trustee.  This Decision will also be forwarded to the Departmental Disciplinary Committee of the New York State Supreme Court, Appellate Division, First Judicial Department.  A separate order will issue.



**Dated: Brooklyn, New York**
**June 5, 2012**

_____
**Carla E. Craig**
**United States Bankruptcy Judge**